Jim L. **WOOLSEY**, Plaintiff–Appellant,

v.

**MARION LABORATORIES, INC.;** Marion Laboratories, Inc., Profit Sharing Plan, Defendants–Appellees.

No. 90–6011.

United States Court of Appeals, Tenth Circuit.

June 4, 1991.

**1454**

Keith M. Pyburn, Jr. of McCalla, Thompson, Pyburn & Ridley, New Orleans, La., (Howard Shapiro and Heather G. Magier of McCalla, Thompson, Pyburn & Ridley, New Orleans, La., and Page Dobson of Holloway, Dobson, Hudson and Bachman, Oklahoma City, Okl., with him on the briefs), for defendants-appellees.

Before McKAY, ANDERSON, Circuit Judges, and BROWN,* District Judge.

STEPHEN H. ANDERSON, Circuit Judge.

Jim L. Woolsey brought this action in district court against Marion Laboratories, Inc. ("Marion") and the Marion Laboratories, Inc. Profit Sharing Plan (the "Plan"), (collectively referred to as "defendants"), claiming that the form in which the Plan distributed his vested benefits violated 29 U.S.C. §§ 1132 and 1140, part of the Employee Retirement Income Security Act ("ERISA"). On appeal, Woolsey, first, seeks reversal of the district court order granting summary judgment to the defendants and, second, claims that the district court erred in denying his motion to amend. We affirm.

## BACKGROUND

Mr. Woolsey worked for Marion for over seventeen years until he resigned on November 11, 1985. Throughout Woolsey's employ, Marion maintained the Plan, subject to the provisions of ERISA, to pay benefits to eligible employees upon retirement, death, disability, or other separation from service. The Plan is funded with annual contributions from Marion, with all such monies, once contributed, belonging irrevocably to the Plan. The Plan Administrators, appointed by the Marion Board of Directors, also serve as officers of Marion. When Woolsey resigned, he was 100% vested in the Plan and was entitled to $234,631.82 in benefits.

Steven M. Angel, Oklahoma City, Okl., for plaintiff-appellant.

---

* Hon. Wesley E. Brown, United States District Judge for the District of Kansas, sitting by designation.

In a letter dated November 27, 1985, Marion asked Woolsey whether he preferred to receive the portion of his vested benefit allocated to the Marion Fund (a particular fund invested primarily in Marion stock) in cash, stock, a combination of the two or periodic cash installment payments. Woolsey requested 50% of his benefit to be paid in cash and the remaining 50% in Marion stock. After a claims review meeting on February 24, 1986, the Administrators exercised the discretion reserved to them under Section 7.1 of the Plan and denied Woolsey's request. They then informed Woolsey of their decision and tendered checks to him for the full amount of his vested benefit. A short time later, a stock split occurred, significantly increasing the value of Marion stock.

Woolsey returned the checks to Marion and requested that Marion issue a check for half of the amount due from the Marion Fund ($109,856.65) and requested a review of the Administrators' decision regarding the form of the other half of his benefit payment. Marion complied and issued the check, noting that Woolsey's request had been denied because of the "special circumstances surrounding [his] termination." R. Doc. 41, Exh. B–6. Subsequently Marion advised Woolsey that a hearing would be held on December 15, 1986.

At the December hearing, the Administrators heard from Charlie Dalton, counsel for Marion, and two employees of Marion— Norm Craig, a regional manager, and Steve Krohne, manager of personnel support services. They presented the following evidence: In July, Woolsey had been informed by Myrna West, his new district manager, that she did not care how he had sold pharmaceuticals in the past, but she wanted to run a "clean ship" from then on. Woolsey allegedly told her that she would not discover any unethical activities as she reviewed the books. In early September, West told Craig that she had discovered that Woolsey had been selling pharmaceuticals outside his designated area for some time. Craig and Krohne flew down to Oklahoma to talk with Woolsey and get more information about what may have happened. Craig stated that he did not

intend to "nail" Woolsey and, indeed, had a great deal of respect for Woolsey who had become a member of the Marion "M Club," "the most coveted [salesmanship] organization in th[e] company." R. Doc. 41, Exh. G at 22. Woolsey allegedly admitted to Craig that, after he had spoken with West, he had breached Marion policy and procedure by working outside the boundaries of his territory, essentially stealing sales from his coworkers, and adding samples and stock pharmaceuticals to regular orders in order to "sweeten the pot" and encourage pharmacists to place larger orders. Woolsey also allegedly admitted that he had falsely reported lost pharmacy orders to obtain the replacement drugs and to give large amounts of credit to his customers. Craig and Krohne stayed in Oklahoma for three days, talking with West, Woolsey and several other employees. They then returned to Kansas and reported their findings to the senior management at Marion. The Marion officials requested Woolsey to come to Kansas, presumably for further investigation and discussion. Woolsey then resigned and refused to go to Kansas.

After presentation of this information, Woolsey and his attorney were allowed to enter the room and submit any information or arguments for reversal of the Administrators' prior decision regarding the form of payments to Woolsey. Woolsey's counsel argued that the acts taken by the Administrators were not in the best interests of the beneficiaries, that they had acted improperly because of an alleged conflict of interest and that any discipline for Woolsey's alleged misconduct should have been part of his termination proceedings, not part of his benefit payment proceedings. He also argued that Woolsey had been deprived of a property right in his vested benefits and that an employee's conduct should serve as the basis for the Plan's vesting requirements, not for determining the form of vested payments.

The Administrators subsequently informed Woolsey that they affirmed their prior decision that "special circumstances" existed justifying the denial of the stock distribution. Such circumstances included,

**1456**

but were not limited to, a number of Woolsey's abuses of company policy: pursuing and obtaining orders for Marion products outside his assigned territory; supplying customers with sample and stock pharmaceuticals to persuade them to increase or place an order with himself; writing unauthorized credits to pharmacies for "lost" product; and, obtaining additional product to "buy orders" from customers. In addition, they noted that Woolsey had been advised that he must discontinue such practices by his superior and had not. They stated:

> The Administrators believe that if they were to reward associates leaving under less than admirable conditions by granting them Marion stock, the stock price would likely decrease to the detriment of the remaining participants in the Plan, which would have not only an adverse monetary affect on the overall value of the Plan, but an adverse affect on associate morale as well.

R. Doc. 41, Exh. B–10 at 2.

The defendants admit that this is the first time that the Administrators have ever denied an otherwise eligible associate's request for payment of half of his benefits in stock.

Woolsey filed his complaint on April 18, 1988 alleging that he had been denied his vested benefit rights in violation of 29 U.S.C. § 1132 and that the Plan had discriminated against him in violation of 29 U.S.C. § 1140. On March 31, 1989, the defendants filed a motion to dismiss, or in the alternative, for summary judgment. Both parties extensively briefed that motion. On September 16, 1989, nearly 17 months after the filing of the complaint, Woolsey filed a motion for leave to file an amended complaint adding new parties and another cause of action against the defendants for having failed to provide him with requested information regarding the denial of benefits and the appeal of that denial as required under ERISA. The district court denied that motion on October 13, 1989 because it would necessitate additional delay and expense to the parties and because "[n]o evidence is available now which Wool-

sey was not aware of or could have been aware of when the case was filed." R.Vol. I, Tab 64.

On December 11, 1989, after oral argument on the issue, the district court held that there was no evidence indicating that Marion and the Plan acted arbitrarily or capriciously in determining the form of benefit payments to Woolsey or that they had discriminated against him in order to prevent him from exercising his pension rights. R.Tab 68. Finding no genuine issue of material fact supporting Woolsey's claims, the district court granted defendants' motion for summary judgment.

Woolsey now appeals both of the district court's holdings and reurges his arguments on appeal.

## SUMMARY JUDGMENT

Woolsey contends that the district court erred in granting the defendants' motion for summary judgment and argues that there are substantial factual disputes which should be litigated at trial. We disagree.

On appeal from a summary judgment order, we apply the same standard employed by the district court in reviewing the Administrators' decision. *Applied Genetics Int'l, Inc. v. First Affiliated Secur., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir.1985). Thus, we will affirm if we determine that, viewing the facts in the light most favorable to the opposing party, there is no genuine issue of material fact in dispute and the moving party should prevail as a matter of law. *Applied Genetics Int'l, Inc. v. First Affiliated Secur., Inc.*, 912 F.2d at 1241; *Jung v. FMC Corp.*, 755 F.2d at 710.

*Denial of Benefit Payment in Stock: § 1132*

■ Woolsey first challenges the trial court's grant of summary judgment regarding the Administrators' alleged violation of 29 U.S.C. § 1132 in denying Woolsey's request for payment in Marion stock. The decisions of the administrators of a pension plan will be upheld unless they are

arbitrary and capricious, not supported by substantial evidence or erroneous on a question of law. *Pratt v. Petroleum Prod. Management, Inc. Employee Sav. Plan & Trust,* 920 F.2d 651, 657 (10th Cir.1990); *Torix v. Ball Corp.,* 862 F.2d 1428, 1429 (10th Cir.1988); *Sage v. Automation, Inc. Pension Plan & Trust,* 845 F.2d 885, 895 (10th Cir.1988). For claims brought under § 1132, this "deferential standard of review [is] appropriate when a trustee exercises discretionary powers.... [and] 'a court of equity will not interfere to control [trustees] in the exercise of a discretion vested in them by the instrument under which they act.'" *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989) (emphasis omitted) (quoting *Nichols v. Eaton,* 91 U.S. 716, 724–25, 23 L.Ed. 254 (1875)); *see Pratt v. Petroleum Prod. Management, Inc. Employee Sav. Plan & Trust,* 920 F.2d at 658 (deference given to claim brought under § 1132 regarding trustee's discretionary decision regarding valuation of benefits); *Cotter v. Eastern Conference of Teamsters Retirement Plan,* 898 F.2d 424, 427 (4th Cir.1990) (claims other than those for benefits eligibility brought under § 1132 fall under the *Bruch* standard).

The Plan before us expressly provides that, upon termination of employment, the full amount of an employee's pension benefits

shall be distributed to the Member as the Plan Administrator, *in his sole discretion,* after consulting with the Member, shall determine and direct, either:

(a) As a lump sum payment in cash or in kind, or part in cash and part in kind.

(b) In annual installments over a period of years....

(c) Any combination of the foregoing.

R. Doc. 41, Exh. A, § 7.1 at 30 (emphasis added). Furthermore, the Plan grants the Administrator "full and complete authority, responsibility, and control over the management, administration and operation of the Plan, including, but not limited to, the authority to ... [m]ake appropriate determinations ... of the distributions due Members under the Plan [and a]uthorize

and direct payment of benefits." *Id.* § 13.3 at 50; *see Pratt v. Petroleum Prod. Management, Inc. Employee Sav. Plan & Trust,* 920 F.2d at 658 (authority to act under the Plan carries with it discretion to act). Thus, in determining whether the district court erred in granting summary judgment, we review the Administrators' decision regarding the form of benefit payments under the arbitrary and capricious standard.

■ Woolsey contends that he has been denied his vested pension benefits because the Plan denied his request for partial payment in stock. However, "ERISA does not mandate any specific mode of payment for retirement benefits." *Oster v. Barco of Cal. Employees' Retirement Plan,* 869 F.2d 1215, 1218 (9th Cir.1988) (citing *Pompano v. Michael Schiavone & Sons, Inc.,* 680 F.2d 911, 914 (2d Cir.), *cert. denied,* 459 U.S. 1039, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982)). Rather, ERISA guarantees only the right to receive the vested benefits. *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 512, 101 S.Ct. 1895, 1900, 68 L.Ed.2d 402 (1981) (ERISA assures claim to protected benefit but not a particular amount or method for calculation). "Any right to ... a particular method of payment must be found in the individual agreements." *Fine v. Semet,* 699 F.2d 1091, 1093 (11th Cir.1983). No such right is established by the Plan in this case.

The Plan does not guarantee payment of benefits in the method preferred by eligible participants. Instead, it expressly grants the Administrators sole discretion in determining the form of payment. Thus, despite Woolsey's valiant attempts to convince us otherwise, he did not have a right to payment in stock and the Administrators' decision to pay the entire vested amount in a lump sum did not deprive him of a vested benefit.

Even so, we must now determine if the Administrators' reasons for denying Woolsey's request were so insufficient or unreasonable as to be arbitrary and capricious. *Oster v. Barco of Cal. Employees' Retirement Plan,* 869 F.2d at 1218; *Fine v. Semet,* 699 F.2d at 1095.

■ Woolsey asserts several bases for his contention that the Administrators acted arbitrarily and capriciously. We deal with each in turn. First, he contends that ERISA prohibits the denial of benefits because of alleged wrongdoing during employment. In support of his argument, Woolsey cites to *McLaughlin v. Lindemann*, 853 F.2d 1307 (5th Cir.1988), *United Metal Products Corp. v. National Bank of Detroit*, 811 F.2d 297 (6th Cir.1987), *cert. dismissed*, 485 U.S. 1017, 108 S.Ct. 1494, 99 L.Ed.2d 883 (1988), and *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990). These cases, however, are vastly different than the one before us now. In each of those cases, the court held that ERISA's nonforfeiture and nonalienation sections, 29 U.S.C. §§ 1056(c), (d), prohibited the forfeiture, garnishment or offsetting of a participant's vested pension payments by his employer even though the participant had embezzled funds or committed fraud against his employer or had breached a fiduciary duty causing a loss to be suffered by the plan.

Here, as discussed above, the Administrators have not used Woolsey's alleged misconduct in order to avoid paying him his rightful benefits. They have considered evidence of Woolsey's actions only in determining the *form* of those benefits. Other courts have held that fiduciaries exercising discretion as to the form of pension benefits may properly consider acts of the claimant which adversely affect the employer or which violate company policy. In *Severs v. Allied Const. Services, Inc.*, 795 F.2d 649 (8th Cir.1986), and *Morse v. Stanley*, 732 F.2d 1139, 1146 (2d Cir.1984), the circuit courts, under similar discretionary plan provisions, upheld the administrators' denial of a lump sum payment to employees leaving the company to work for a competitor. In *Severs*, the plan administrators, like the Administrators here, based their decision in part on their

> obligation to the remaining participants not to reward [a] former employee whose conduct may impair the Profit Sharing Plan's funding and valuation by reducing the amount of profits generated by Al-

lied's business [and on the claimant's] failure to present facts which show extraordinary need or hardship that would justify a different determination under the circumstances....

*Severs v. Allied Const. Services, Inc.*, 795 F.2d at 650; *see Morse v. Stanley*, 732 F.2d at 1144, 1146. The courts held that since the plaintiffs would each receive their vested benefits in full, the Trustees did not act arbitrarily or in bad faith in denying them accelerated distributions. *Severs v. Allied Const. Services, Inc.*, 795 F.2d at 651; *Morse v. Stanley*, 732 F.2d at 1144.

Furthermore, ERISA requires that the Plan be administered with an eye solely to the best interests of all the beneficiaries. "[T]o award those departing employees with a financial windfall would in fact have preferred them at the expense of the entire trust." *Morse v. Stanley*, 732 F.2d at 1146. Thus, the Administrators properly considered Woolsey's misconduct in determining the effect payment of his benefits in stock would have had on the Plan and the remaining beneficiaries and their determination that such payment would be to the detriment of future beneficiaries was not arbitrary and capricious.

■ Second, Woolsey argues that the Administrators acted arbitrarily in failing to comply with the 1982 Guidelines adopted by the Plan to assist them in exercising their judgment in authorizing stock payments. Woolsey contends that those Guidelines establish the exclusive set of factors that the Administrators may consider and asserts that the Guidelines require the Administrators to pay all "long-term associates" in stock, if requested. The Guidelines state, in part:

> [The Administrators'] objective is to make sure that long-term associates currently terminating, as well as those terminating in the future will have available to them an adequate number of Marion shares should they request a stock distribution from their Marion Fund assets.... *In the absence of special circumstances*, the Plan Administrators will *probably* allow Plan Participants to have up to 50% of their Marion Fund

assets distributed to them in Marion shares if they are early or normal retirees, disabled associates or deceased associates, or if they have become fully vested or have ten or more years of service. . . . *Notwithstanding the foregoing guidelines, the Administrators, in all cases, will reserve discretion in determining which Participants may receive stock distributions and the amount thereof, taking into account the unique needs of any terminating Participant, the number of shares in the Marion Fund and other investments and cash or cash equivalents in the Marion Fund.*

R. Doc. 41, Exh. B–7. Nothing in the Guidelines indicates that it is an exclusive list of factors for determining the manner of payment of benefits or that *all* "long-term associates" will automatically receive stock if they request such payment. Nor is the consideration of performance or misconduct during employment specifically excluded. Instead, the Guidelines expressly leave the ultimate payment decision in the Administrators' sole discretion and even suggest that other unlisted "special circumstances" may exist justifying the denial of a request for stock payment.

■ Third, Woolsey contends that the Administrators acted arbitrarily and capriciously because they acted under a conflict of interest. He alleges that the Administrators, all stockholders and participants in the Plan, operated as agents of Marion in order to punish him for his conduct during his employment rather than acting solely in the interest of the beneficiaries. He also claims that they knew a stock split was imminent and purposely denied him the benefit of the increased stock value to enhance their own position. He asserts that, under *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), such a conflict of interest "is a basis for concluding that Defendants actions were arbitrary and capricious." Appellant's Brief at 22. We disagree.

*Bruch* acknowledged that if an administrator or fiduciary operates under a conflict of interest, that conflict is a relevant factor in determining whether the administrator abused his discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. at 115, 109 S.Ct. at 956. Contrary to Woolsey's assertion, however, the fact that an Administrator serves dual roles as company employee and as a pension plan fiduciary does not conclusively or presumptively establish that the administrators of the plan have acted arbitrarily and capriciously. *Newell v. Prudential Ins. Co. of America*, 904 F.2d 644, 649–50 (11th Cir.1990); *De Nobel v. Vitro Corp.*, 885 F.2d 1180, 1191 (4th Cir.1989); *see Oster v. Barco of Cal. Employees' Retirement Plan*, 869 F.2d at 1217, 1220; *Morse v. Stanley*, 732 F.2d at 1146.

■ In addition, Woolsey fails to argue that a real conflict exists. Woolsey suggests only that Marion obtained some type of psychic benefit from punishing him for his misconduct. He does not contend, nor does the record support, a finding that Marion financially benefited in any way from the Administrators' choice of distribution. Rather, while Marion makes contributions to the Plan's fund, the Plan has a nonreversion clause stating that "the Company shall not have any right, title, or interest in the contributions made by it under the Plan and no part of the Trust Fund shall revert to it or for its benefit." R. Doc. 41, Exh. A, § 12.2 at 47. Thus, Marion incurs no direct expense as a result of favorable benefit payments to beneficiaries nor benefits from denials of payment. Instead, the retention of stock by the Plan solely enhances the viability of the Plan's fund and the denial of Woolsey's claim benefits only future beneficiaries, not Marion. *See De Nobel v. Vitro Corp.*, 885 F.2d at 1191; *Oster v. Barco of Cal. Employees' Retirement Plan*, 869 F.2d at 1217. The Administrators' choice of payment, therefore, reflects proper fiduciary concern for the interests of the future participants, rather than a conflict of interest with Marion. *See Morse v. Stanley*, 732 F.2d at 1146.

■ That the Administrators themselves may incidentally benefit by the retention of

stock in the Marion Fund as future beneficiaries of the Plan similarly suggests no presumptive conflict of interest. *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982); *see Sage v. Automation, Inc. Pension Plan & Trust,* 845 F.2d 885, 895 (10th Cir.1988). Upon review, we believe "this dispute is more properly characterized as one involving the trustee's balancing of interests between [a] present claimant[ ] ... and future claimants," *Sage v. Automation, Inc. Pension Plan & Trust,* 845 F.2d at 895, rather than a conflict between the Administrators and Woolsey.

■ Fourth, Woolsey contends that since the defendants had granted all prior claimants' requests for payment of pension benefits in Marion stock, they have acted arbitrarily and capriciously in denying his request. In determining whether the administrators acted arbitrarily and capriciously in denying a claimant's request for payment of his benefits in a lump sum, the Second Circuit stated that:

> Whether the [Administrators] had in the past granted acceleration to employees who requested it does not mean that they had donned a discretionary strait-jacket which held them bound to grant acceleration in all cases as a matter of course. On the contrary, the Plan gave them broad discretion to evaluate requests for accelerated distribution on a case by case basis.

*Morse v. Stanley,* 732 F.2d at 1144; *see Oster v. Barco of Cal. Employees' Retirement Plan,* 869 F.2d at 1219; *Denton v. First Nat'l Bank of Waco, Texas,* 765 F.2d 1295, 1300 (5th Cir.1985); *Fine v. Semet,* 699 F.2d at 1094. Similarly, the Adminis-

trators' prior approval of benefit payments in stock do not automatically make their present decision arbitrary and capricious.

■ Woolsey also argues that the decision of the Administrators should be overturned because it was not based on substantial evidence. He apparently argues that the evidence was insufficient because he was unable to refute or challenge Craig and Krohne's allegations of misconduct because he was not present during their presentation and because he did not know why his request had been denied prior to the hearing.[1]

In determining whether the decision was supported by substantial evidence, we consider only the facts before the Administrators at the time of their decision. *Perry v. Simplicity Engineering,* 900 F.2d 963, 966 (6th Cir.1990); *Voliva v. Seafarers Pension Plan,* 858 F.2d 195, 196 (4th Cir.1988). *But cf. Moon v. American Home Assur. Co.,* 888 F.2d 86, 89 (11th Cir.1989). The Administrators' decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within their knowledge to counter a claim that it was arbitrary or capricious. *See Weir v. Anaconda Co.,* 773 F.2d 1073, 1081 (10th Cir.1985); *Denton v. First Nat'l Bank of Waco, Texas,* 765 F.2d 1295, 1304 (5th Cir.1985) (reviewing court should evaluate only if reliance was reasonable, not necessarily correct). "We will not substitute our judgment for the judgment of the [Administrators] unless 'the actions of the [Administrators] are not grounded on *any* reasonable basis.' " *Oster v. Barco of Cal. Employees' Retirement Plan,* 869 F.2d at 1218 (emphasis in original) (quoting *Elser v. I.A.M. Nat'l Pension Fund,* 684 F.2d

---

1. These complaints fall flat in light of Woolsey's counsel's references at the hearing to Woolsey's conduct during employment and his arguments that any misconduct by his client should be reviewed solely in termination proceedings or as conditions to vesting of retirement benefits, not in determining the form of such benefits. Indeed, his counsel stated, "The conclusion that I have to make on what information has been furnished me both by letter and directly is that this is some sort of punishment for a purported job misbehavior." R. Doc. 41, Exh. G at 56. In addition, the Administrators had previously in-

formed Woolsey that they had denied his request "after serious consideration of the special circumstances surrounding [his] termination." R. Doc. 41, Exh. B–6. Having such notice, we can only conclude that Woolsey and his attorney knew of the specific reasons for the denial of his request or at least had the opportunity at the hearing to question the Administrators about those reasons. They failed to do so and cannot now claim that they were unable to challenge any erroneous beliefs the Administrators may have held regarding Woolsey's employment.

648, 656 (9th Cir.1982)). We find that the Administrators reasonably relied on the reports of the two Marion managers and the evidence presented at the hearing was sufficient to support the Administrators' determination that payment of Woolsey's benefits in stock would not be in the best interests of future Plan beneficiaries.

 Woolsey finally argues that the defendants violated the requirements of 29 U.S.C. § 1133 in failing to provide him with adequate notice and specific explanation for the denial of his request and claims that his hearing was unfair, unduly delayed and denied him fundamental due process. However, ERISA and the Plan only require such notice and review in cases where a plan participant is denied his benefit. The denial of requests for certain forms of benefits, rather than for the benefit itself, do not require notice or review under § 1133. *Pompano v. Michael Schiavone & Sons, Inc.*, 680 F.2d 911, 916 (2d Cir.1982) (cited with approval in *Morse v. Stanley*, 732 F.2d 1139, 1147 (2d Cir.1984)).

In sum, Woolsey was entitled to the full value of his benefits. That is all ERISA protects. That is all the Plan grants him. Woolsey complains now because the stock he desired has substantially increased in value. However, he has no legitimate expectation in anything more than the value of his vested benefit at the time of valuation and has no right, statutory or contractual, to a windfall resulting from the subsequent increased value of the Marion stock. Woolsey has been tendered the full amount of his vested benefit and is entitled to no more.

We find that there is no material fact in dispute as to whether the defendants acted arbitrarily and capriciously in denying Woolsey's payment request and that, as a matter of law, the defendants should prevail.

*Discrimination: § 1140*

 Woolsey argues that, in denying him his preferred form of payments, the defendants discriminated against him in violation of 29 U.S.C. § 1140 and that the district court erred in granting summary judgment on this issue. He alleges that the defendants refused to grant his payment request, although granted to every other participant who had requested such payment, in order to "punish" him for his alleged wrongdoing during his employ. He suggests, without support, that § 1140 should be read broadly to reach conduct "where the employer interferes with a participant's *election* of a benefit." Appellant's Brief at 27 (emphasis added). We disagree.

Section 1140 states, in relevant part, that:

> It shall be unlawful ... to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan [or this Act].

Woolsey has presented no actionable claim under this section. First, as discussed above, he has not been deprived of a vested right. *West v. Greyhound Corp.*, 813 F.2d 951, 955 (9th Cir.1987) (no violation of § 1140 where employees not denied vested benefits); *see Gavalik v. Continental Can Co.*, 812 F.2d 834, 852 (3d Cir.) (employer must interfere with attainment of right to which employee may become entitled), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987). Second, the Administrators' denial has not affected Woolsey's employment situation. Section 1140 was

> designed to protect the employment relationship against actions designed to interfere with, or discriminate against, the attainment of a pension right.... Simply put, [§ 1140] was designed to protect the employment relationship which *gives rise* to an individual's pension rights. *West v. Butler*, 621 F.2d 240, 245 (6th Cir.1980). This means that a fundamental prerequisite to a [§ 1140] action is an allegation that the employer-employee relationship ... was changed in some discriminatory or wrongful way.

*Deeming v. American Standard, Inc.*, 905 F.2d 1124, 1127 (7th Cir.1990) (emphasis in original) (footnote omitted). No such interference occurred in this case. Woolsey admits that he voluntarily resigned from em-

ployment and that the Administrators denied his request for stock payment only after such termination.

Since Woolsey has failed to state any facts that would support a § 1140 claim, the district court order of summary judgment was correct.

## DENIAL OF MOTION TO AMEND COMPLAINT

Woolsey contends that the district court erred in denying his motion to amend his original complaint pursuant to Federal Rule of Civil Procedure 15(a). We disagree.

 The decision to grant leave to amend a complaint, after the permissive period, is within the trial court's discretion, Fed.R.Civ.P. 15(a), and will not be disturbed absent an abuse of that discretion. *Las Vegas Ice and Cold Storage Co. v. Far West Bank*, 893 F.2d 1182, 1185 (10th Cir.1990); *State Distributors, Inc. v. Glenmore Distilleries Co.*, 738 F.2d 405, 416 (10th Cir.1984).

 Woolsey argues that "motions [to amend] are to be denied only when the delay in seeking amendment is motivated by bad faith or is prejudicial to defendants." Appellant's Brief at 18. Thus, he contends that since the defendants have not been prejudiced, the court's denial constituted error. While prejudice may be one ground justifying a denial of leave to amend, such a showing is not necessary. Indeed, "[u]ntimeliness alone may be a sufficient basis for denial of leave to amend.... [P]rejudice to the opposing party need not also be shown." *Las Vegas Ice and Cold Storage Co. v. Far West Bank*, 893 F.2d at 1185; *see First City Bank v. Air Capitol Aircraft Sales, Inc.*, 820 F.2d 1127, 1132–33 (10th Cir.1987).

Woolsey filed his motion to amend nearly 17 months after the filing of the original complaint. Because the motion was untimely, the court acted within its discretion in denying the motion. In addition, Woolsey offered no explanation for the delay, another factor supporting a denial of leave to amend. *Las Vegas Ice and Cold Stor-*

*age Co. v. Far West Bank*, 893 F.2d at 1185. Instead, Woolsey's counsel simply noted that, "in researching another matter [he] ha[d] identified an additional cause of action under ERISA." R.Tab 58.

Furthermore, the court specifically noted that no new evidence that was unavailable at the original filing had come to Woolsey's attention. "Where the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial." *Las Vegas Ice and Cold Storage Co. v. Far West Bank*, 893 F.2d at 1185 (quoting *State Distributors, Inc. v. Glenmore Distilleries, Co.*, 738 F.2d at 416).

Given the untimely filing of the motion and the lack of new information justifying the delay in adding a new claim, we find that the district court acted within its discretion in denying Woolsey's motion to amend.

In accordance with the foregoing, we AFFIRM.